On Application for Rehearing. •
 

 PER CURIAM.
 

 'The relators in their application for a rehearing have asked us to clarify our opinion and decree by pointing out whether or not they affect the constitutionality of Acts 44, 47 and 48 of 1940 in their entirety, or whether these statutes are partially affected, and, if so, what parts thereof are valid and what parts are invalid.
 

 The sole issue before the Court was whether or not Act 384 of 1940 was adopted in accordance with the sacramental provisions of the Constitution. The question of the constitutionality of Acts 44, 47 and 48 of 1940 was in no way brought into this litigation either by the relators or the respondents. We have no authority in this case to express any opinion as to the legality of departments, boards, or agencies created by Acts 44, 47 and 48 of 1940, or the powers conferred upon public officials thereunder. Such gratuitous statements on our part would be purely obita dicta.
 

 . [42] This Court is without jurisdiction to give advisory opinions or render declaratory judgments. To pass upon the constitutionality of Acts 44, 47 and 48 of 1940 in this case would be clearly giving an advisory opinion or rendering a declaratory judgment. This, we decline to do.
 

 In the alternative, the relators, in their application for a rehearing have asked us to advance upon our docket the civil suit of the State of Louisiana et al. v. James Thomas et al., No. 36,310 of the docket of this Court, on appeal from a judgment of the Nineteenth Judicial District Court in and for the Parish of East Baton Rouge, declaring Act 13 of 1940, known as the Louisiana Crime Commission Statute and Act 47 of 1940, generally referred to as the State Administrative Code, unconstitutional, null and void, and to consolidate it with this case. The record in that proceeding was filed in this Court on June 27, 1941, or three days before our opinion and decree were handed down in this case on June 30, 1941. In the Thomas case, the Department of Highways of the State of Louisiana, the Attorney General and the Louisiana Crime Commission instituted suit against thirteen individual defendants and partnerships located in various parishes throughout the State to recover the sum of $1,910.55, which the defendants are alleged to have unlawfully obtained from the State. In this case, six taxpayers and citizens of East Baton Rouge Parish are the plaintiffs, and the State Treasurer, the State Auditor, and the State Budget Director are the defendants. It is clear, therefore, that the parties in the two suits are not the same.
 

 Most of the defenses in the Thomas case differ from those in this case and particularly the eleven alleged grounds of unconstitutionality of Act 13 of 1940, none of which has any bearing on the issues in the present suit. Several of the alleged grounds of unconstitutionality of Act 47 of 1940 are entirely different from those in the instant case. The only common issue in the two cases is that Act 47 of 1940 is said to be unconstitutional, because it is alleged to
 
 *604
 
 be an enabling act predicated on Act 384 of 1940, the joint resolution known as proposed constitutional amendment No. 3, which the defendants in the Thomas case also asserted was not adopted in conformity with the Constitution.
 

 The defendants in the Thomas case are entitled under the rules of this Court to have it regularly set for hearing and the plaintiffs therein, under our Rule IX, Sections 2 and 3, had the right to file the motion to have the case fixed by preference and placed on our preference docket to be heard summarily as possible, but, as the defendants have not joined in the motion to advance and consolidate, they cannot be compelled to have the case argued and submitted during the vacation period of this Court. It is also impossible to consolidate the two cases under the law because they do not involve the same parties litigant nor the same facts and issues, except for the single point as to Act 47 of 1940.
 

 We reiterate that the relators were content with having only the constitutionality of Act 384 of 1940 determined in the instant case and in no way sought to have the Court pass upon the constitutionality of Acts 44, 47 and 48 of 1940 in this suit, and, therefore, we are without authority to consider whether or not Acts 44, 47 and 48 of 1940 are wholly or partially unconstitutional in the present case, because the pleadings herein in no wise propose or suggest any such issue. Moreover, the briefs filed during the trial of the case both in the district court and in this Court in no way suggested that we determine whether or not Acts 44, 47 and 48 of 1940 are unconstitutional in whole or in part. We,' therefore, find it impossible to grant the requests of the relators in this respect.
 

 In the briefs filed by the relators and amici curiae in this matter on the application for rehearing, it is argued for the first time in this Court that the decree of the district court, which was affirmed by us when Act 384 of 1940 was held to be void, is much broader and more far-reaching in its terms than it should be in view of the fact that the only question involved in the case was the validity vel non of Act 384 of 1940. The decree restrains the State Treasurer and the State Auditor from transferring any funds appropriated to various State Agencies named in Act 44 of 1940 (which were in existence prior to the passage of Acts 47 and 48 of 1940) to the State Agencies listed under Act 384 of 1940. The agencies listed under Act 384 of 1940 are the same State agencies which were created under Title III of Act 47 of 1940 and, by that Act and Act 384, many of the various State Agencies heretofore existing under the Constitution and laws of this State were consolidated and others were abolished.
 

 Since the question of the constitutionality of Act 47 of 1940, by which the duties and functions of the State Agencies listed in Act 384 are set out and defined, cannot be passed upon by us in this matter and since the decree prohibits the State Treasurer and the State Auditor from transferring any funds to those agencies, it is possible that these officials may take the position that they would violate the decree
 
 *606
 
 of the district court, if they transferred funds appropriated by the General Appropriations Act (Act 44 of 1940) to any of the agencies created by Act 47 of 1940 and listed in Act 384 of 1940.
 

 [45] Therefore, in order to avoid any misunderstanding, we feel that the decree of the district court should be modified so as not to restrain the State Treasurer and the State Auditor from transferring' any funds appropriated to any State officers or agencies by Act 44 of 1940 to any State agencies created by Act 47 of 1940 and listed in Act 384 of 1940, provided the agencies to whom the otherwise appropriated funds are to be transferred are not dependent upon the validity of Act 384 of 1940 for their legal existence. However, since by Act 384 of 1940 many offices, boards, and other State agencies created by and under the authority of the Constitution of 1921 were abolished or their duties and functions curtailed, and since we have found that this proposed constitutional amendment is void, the State Treasurer and the State Auditor should be enjoined from transferring any funds appropriated to these constitutional officers, boards and agencies by Act 44 of 1940, to any of the agencies listed in Act 384 of 1940. The decree will be modified accordingly.
 

 [46] It is said that chaos and confusion in the governmental affairs of the State will result from the Court’s action in declaring the proposed constitutional amendment void. This statement is grossly and manifestly inaccurate. If confusion and chaos should ensue, it will not be due to the action of the Court but will be the re-suit of the failure of the drafters of the - joint resolution to observe, follow and obey the plain essential provisions of the Constitution. Furthermore, to say that, unless the Court disregards its sworn duty to enforce the Constitution, chaos and confusion will result, is an inherently weak argument in favor of the alleged constitutipnality of the proposed amendment. It is obvious that, if the Court were to countenance the violations of the sacramental provisions of the Constitution, those who would thereafter desire to violate it and disregard its clear mandatory provisions would resort to the scheme "of involving and confusing the affairs of the State and then simply tell the Court that it was powerless to exercise one of its primary functions by' rendering the proper decree to make the Constitution effective.
 

 [47] It is stated that the absolute repeal of Act 2 of the Extra Session of 1927, which was adopted as a constitutional amendment and became Article XVI-A of the Constitution of 1921, by Act 384 of 1940, known as Constitutional Amendment No. 3, only had the effect of eliminating from the Constitution certain obsolete provisions which had been fully carried out by the Reparations Commission of the Caernarvon Crevasse. It is clear that there are several million dollars worth of bonds, which were issued under Act 2 of the Extra Session of 1927, outstanding, and that Section 9 of that Act or constitutional amendment of 1927, is the sole and only authority under which the Board of Levee Commissioners for the Orleans Levee District has the right to annually levy an ad valorem tax not exceeding one mill on
 
 *608
 
 all of the real property located in the Parish of Orleans, and that these taxes are dedicated for the retirement of both the principal and interest of the bonds. We have not been referred to any provision in any law which replaces Section 9 .of Act 2 of the Extra Session of 1927 and it is, therefore, apparent that no funds would be available to retire the bonds and pay the interest coupons as they mature, in the event the Court were to hold that the constitutional amendment, Act 384 of 1940, was constitutionally adopted. The Board’s authority to annually levy the tax to provide the funds to retire the bonds and pay the interest thereon was unquestionably, withdrawn by the proposed amendment. We have already pointed out in our opinion that the Caernarvon Crevasse bond issue is a separate and distinct object from the several other objects covered by the proposed constitutional amendment, Act 384 of 1940, and, in that respect the amendment violates the mandatory separability provision of the Constitution of 1921.
 

 President Lincoln’s memorable statement in his immortal address delivered in 1863, at Gettysburg, that this is
 
 “ * *
 
 * a government of the people, by the people, for the people, * * * ” has an historical background. Forty-four years prior thereto, in the case of McCulloch v. Maryland, 1819, 4 Wheat. 316, 403-405, 4 L.Ed. 579, where the United States Supreme Court declared an act of the Legislature of Maryland unconstitutional, Chief Justice Marshall stated that the Government of the United States is “ * * * 'emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit. * * * ” Daniel Webster in his Reply to Hayne in .the United States Senate in the year 1830, in referring to the Government of the United States of America said: “It is * * * the people’s Government; made for the people; made by the people; and answerable to the people.” See Debates, 21st Cong. 1st Sess. 74; Curtis 1, 356-61 and The Life of John Marshall by Beveridge, Vol. 4, Chapter 6, page 293. These statements mean that the people of the United States are living under a constitutional and representative form of government; that they have the right to amend the Constitution in the way in which it designates that it shall be done; that they are entitled under the Constitution to a government divided into three distinct branches, each of which is independent in its respective sphere, namely, the Legislative Department that enacts the law, the Executive Department that enforces the law, and the Judicial Department that interprets and construes the law; that the Judicial Department has the right and it is its duty to determine whether or not the Legislative or the Executive Departments’ actions have transcended and exceeded the constitutional authority vested in them and that each branch operates as a check or balance against the others so that there will not be a usurpation of power or a consolidation of all of the powers in one department, whereby an arbitrary or 'despotic form of government would be created. Surely, President Lincoln, Chief Justice Marshall and Senator Webster did not say,
 
 *610
 
 nor do their words imply, that the majority of the voters of a State have the constitutional right to amend the State Constitution by violating its definite and clear mandatory provisions and by such procedure give their actions the status of a constitutional amendment to be binding upon all of the people in the State.
 

 It cannot be logically and fairly stated that, because this Court has held that the proposed constitutional amendment is void, its holding is, in effect, a declaration that the Supreme Court of Louisiana has arrayed its opinion against the will of 140,000 voters of this State. When the mandatory provisions of the Constitution are violated, the Constitution itself strikes with nullity the act that did violence to its provisions. The Justices of the Supreme Court simply perform their sworn duty to uphold the Constitution by declaring that the offensive act transcends the fundamental law and, therefore, is ineffective. If other officials of the State government intentionally or unintentionally fail to comply with the mandatory provisions of the Constitution — which clearly and explicitly set forth the manner in which that fundamental law shall be amended— it is the absolute right of any citizen and taxpayer to challenge the constitutionality of a proposed amendment and it is the obvious sworn duty of the members of the Supreme Court to declare that the Constitution has been violated and, therefore, the attempt to so amend it was ineffective, not because of the opinion or the will of the Justices of the Court, but because the clear and mandatory provisions of the Constitution under which the proposed amendment was submitted to the people were entirely disregarded and disobeyed. It is the sacred responsibility and duty of the Court of last resort to protect the constitutional rights of the minority against invasion or destruction by the vote of a majority. Otherwise, this would become a government of men and not of law. This cardinal principle is one of the basic pillars of sound, just and stable government by both the Sovereign States and the Sovereign Union. The electors themselves had no thought of destroying a constitutional form of government when they voted for the proposed amendment but to give constitutional effect to the proposed amendment with the sanction of the Court would unquestionably lead to the destruction of the Constitution because the amendment was not predicated and founded upon the observance of the Constitution’s mandatory provisions but was based upon their violation.
 

 It is argued that the Court has thwarted the will of a majority of the voters upon strict legal technicalities. It cannot be truthfully stated nor successfully urged that the clause of the Constitution requiring constitutional amendments to be submitted separately is an unimportant or a technical provision. The purpose of this mandatory provision in the Constitution is to require the Legislature to submit proposed amendments thereto in a manner in which they can be readily understood by the people. The members of the Constitutional Convention, by this provision, sought to prevent the Legislature from grouping together in one proposed amend
 
 *612
 
 ment multiple objects and subjects in such a confusing and complex manner as to make it incomprehensible and, in that way, to avoid the great danger of the people adopting a constitutional amendment which would grant plenary power that would not otherwise have been delegated and entrusted to public officials if the amendment had been properly understood. By grouping a great many objects and subjects together in one amendment, dangerous hidden powers might be obtained by certain officials, which powers could subsequently be used arbitrarily and despotically. The proposed amendment before the Court furnishes its own example. For instance, the power granted to the Board of Levee Commissioners for the Orleans Levee District, .under Section 9 of Act 2 of the Extra Session of 1927, to levy a tax annually, was repealed outright and this left the bonds, which were to have been retired thereby, outstanding and without funds to meet their payment in both principal and interest. Surely, if this particular matter had been made the object of one amendment, so that the members of the Legislature and the people would have understood it, it hardly admits of argument that neither the members of the Legislature nor the electors themselves would have voted to repudiate a just, legal and outstanding obligation such as the bonds in question. But, without doubt, that is just what they have done. This, we submit, demonstrates the great danger of the Legislature disregarding the constitutional mandatory requirements of having each amendment cover one object and only such subjects cognate thereto. When the Constitution expressly states that any amendment thereto shall be submitted to the electors by the Legislature separately, it certainly does not mean that the members of the Legislature shall have the discretion to submit several amendments as one amendment and that they are the sole judges of whether or not they have complied with this provision. When the delegates of the Constitutional Convention concluded that a provision in the Constitution was essential and fundamental they left nothing to the discretion or judgment of the public officials but made the requirement indispensable. Therefore, the mandatory provisions in the Constitution were considered by their authors to be basic and not technical. They knew if the provisions of the Constitution were not followed chaos would inevitably result and democracy would certainly perish. Consequently, it cannot be said that the failure to observe this requirement of the Constitution was a mere legal technicality. This provision is not only imperative but is basic and fundamental. Its violation cannot be cast aside with the appellation that the provision is a simple legal technical requirement. Neither can public clamor lessen its importance as being indispensable for the safety and protection of the property, rights, liberty, and lives of the citizens of a sovereign state under a constitutional form of government. According to the 1940 census there were 2,355,821 inhabitants of this State and the Constitution guarantees to each of them its protection whether they be qualified voters or not. The returns of the election show that 140,543 votes were cast in favor of the amendment and 133,876 votes were cast
 
 *614
 
 against it, thus giving a majority in favor of the amendment of 6,667 votes. But the majority of the voters were powerless to destroy the constitutional rights of the remaining 2,215,278 inhabitants by voting for a legislative joint resolution that did violence to the mandatory provisions of the Constitution from its inception.
 

 In the case of Johnson v. Craft, 205 Ala. 386, 87 So. 375-385, the Supreme Court of Alabama held that the proposed road bond amendment had failed to become a part of the Constitution of Alabama, although a majority of the electors voted for it, because the Legislature had not observed the mandatory provisions of the Constitution by fixing the date of the election. In dealing with the question of “public clamor” and alleged “technicalities”, Justice McClellan, on rehearing, said:
 

 “Since the decision on February 3, 1921, declaring that this ‘road bond amendment’ did not become a part of the Constitution, because of the violation of mandatory provisions of the Constitution, there has appeared distinct manifestations of a desire on the part of some to undertake to influence, through a cultivated public clamor, ¡the judges who formulated the judgment, when they came, as they have now, to reconsider that judgment on rehearing. Ignorance, and nothing worse, accounts for some, if not all, of this activity and publicity; ignorance of the distinction between anarchy and constitutional government; ignorance of the imperative necessity to maintain and preserve the independence of the judiciary, a condition that cannot prevail if extraneous circumstances, unrelated to the law or to judicial processes, are countenanced by worthy citizens; ignorance of the fact that judges are bound by oath, as well as by every sense of self-respecting fidelity and responsibility, to enforce the Constitution, an obligation that rests on the conscience of the individual judge to satisfy which it is given no other judge, or judges, to do, for no judge is made the keeper of the conscience of another judge; ignorance of the fact that no power or authority is conferred on this court or its judges to forgive, condone, or heal violations of plain, unambiguous mandates, prohibitions] or limitations. of the Constitution, even if the violation results in the greatest good or promotes a universal benefaction; for, if ‘forced and unnatural constructions’ of plain, unambiguous provisions of the Constitution are accepted by the courts, ‘they' inflict a wound upon the Constitution which nothing can heal.’ Sadler v. Langham, 34 Ala. [311] 335, where this court, through Stone, J., approved this statement of an absolute judicial rule:
 

 “ ‘My rule has ever been to follow the fundamental law as it is written, regardless-of consequences.’
 

 “Recurring now to the thought of the-quotation (ante) from the brief supporting-the application, this court contemplates with' satisfaction the affirmative disavowal, by the great array of counsel representing appellee, of any participation in the unfortunate, wholly ill-founded sentiment there-said to have found lodgment in the lay-mind that this 'court had, in its judgment,, introduced a ‘technicality’ to defeat the popular will or desire. The state of the-
 
 *616
 
 'public mind’ to which counsel refer would seem impossible of creation or existence in this enlightened state, unless it is assumed that those entertaining the sentiment indicated are unaware or have forgotten that Alabama has a Constitution, supreme and enduring until changed in accordance with its prescriptions, and binding upon all the people, as well as every judge and other officer who has taken his solemn oath to support and vindicate the Constitution. If this ‘public mind’ should consider, as counsel have candidly done in their unreserved disavowal, that all are subject to the paramount government of the Constitution, they would come at once to know that there is no such thing as a ‘technicality’ when the enforcement of mandates of the Constitution is the judicial action required by the Constitution. The Constitution contains no idle assertions, no meaningless language, no ephemeral purpose, no recognition of the right of even all the people— except through revolution and attendant anarchy — or of the Legislature or of the courts to refuse obedience to its supreme authority, or by evasion or subterfuge to defeat the Constitution as the highest expression of the people’s will. The most eminent writer on Constitutions and the jurisprudence that gives them effect (Cooley, p. 88) has said, what all must know, that the court which permits public sentiment to influence a construction of a Constitution that is not warranted by its intent ‘would be justly chargeable with reckless disregard of official oath and public duty’— a charge that represents the acme of odium and the superlative of infidelity. Now, as ever before, the penalty for the violation of the Constitution is that the product of the offense is a nullity.”
 

 George Washington, the Father of our Country, the President of the Constitutional Convention which drafted the Constitution of the United States, and the First President of the United States, in his Farewell Address, made the underlying cardinal principle of this case the subject of his advice to the people, upon his retirement from public office, when he stated:
 

 “It is important, likewise, that the habits of thinking in a free country should inspire caution in those intrusted with its administration, to confine themselves within their respective constitutional spheres, avoiding in the exercise of the powers of one department to encroach upon another. The spirit of encroachment tends to consolidate the powers of all the departments in one, and thus to create, whatever the form of government, a real despotism. A just estimate of that love of power, and proneness to abuse it, which predominates in the human heart, is sufficient to satisfy us of the truth of this position. The necessity of reciprocal checks in the exercise of political power, by dividing and distributing it into different depositaries, and constituting each the guardian of the public weal against invasions by the others, has been evinced by experiments ancient and modern; some of them in our country and under our own eyes. To preserve them must be as necessary as to institute them.
 
 If, in the opinion of the people, the distribution or modification of the constitutional powers be in amy particular wrong, let it be corrected by an amendment in the
 
 
 *618
 

 ■way which the Constitution designates. But let there he no change by usurpation; for though this, in one instance, may be the instrument of good, it is the cmtomcury weapon by zvhich free goziernments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit -which the me can at any time yield.
 
 * * *" (Italics ours.)
 

 It is therefore ordered, adjudged and decreed that the preliminary writ of injunction issued by the district court in this matter be and it is amended and modified so as to read:
 

 “It is ordered, adjudged and decreed that the rule herein issued be made absolute, and, accordingly, that a preliminary injunction issue herein, as prayed for, enjoining, restraining and prohibiting A. P. Tugwell, State Treasurer, and L. B. Baynard, State Auditor, from accepting, honoring and act-' ing upon notice or notices from Grady C. Durham, or any other individual claiming authority to exercise the duties as “Budget Officer”, to transfer funds appropriated to any State officer or State agency named in Act 44 of 1940 whose office or agency has been created by the Constitution of 1921, . as amended, to the agencies listed under Act 384 of 1940, until further orders of the court. The right of plaintiffs and respondents to apply for a rehearing on the question of modification of the injunction of the district court is reserved.
 

 The application of the relators for a rehearing is refused.
 

 ODOM, J., dissents from the refusal to grant a rehearing.